Peter GREENBAUM, Plaintiff,

v.

The BURLINGTON INSURANCE COMPANY, Defendant.

Case No. 16–cv–00511–RS

United States District Court, N.D. California.

Signed 4/3/2017

Brian Banker Miles, Miles and West-brook, Pleasant Hill, CA, Joel Mastin Westbrook, Miles Westbrook, Walnut Creek, CA, for Plaintiff.

Thomas Holden, Greenberg Traurig, LLP, San Francisco, CA, for Defendant.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

RICHARD SEEBORG, United States District Judge

### I. INTRODUCTION

Brandy Miller and her mother Sandra Miller lived rent-free in a house owned by Ester Miller—who is Brandy's grandmother, and Sandra's mother-in-law. One day in 2011, Sandra opened the front door as she was taking out the garbage. Her daughter Brandy's dog ran out the door, and attacked an approaching UPS delivery person, Peter Greenbaum, biting him severely.

Greenbaum sued all three Millers in state court. Ester, as the landlord, maintained a liability insurance policy issued by Burlington Insurance Company, which provided her a defense in the state court action. Burlington declined, however, to provide a defense or indemnity to Brandy and Sandra on any theory that they might qualify as "additional insureds" under the policy.

The state court granted summary judgment for Ester on grounds that a "landlord does not owe a duty of care to protect a third party from his or her tenant's dog unless the landlord has actual knowledge of the dog's dangerous propensities and the ability to control or prevent the harm," and that there was no evidence Ester had such knowledge. The matter proceeded to a bench trial against Brandy and Sandra, with live testimony proffered as to some facts, while other facts were presented by stipulation.

Brandy, as owner of the dog, was found strictly liable. Sandra was found negligent in allowing the dog to go free "while taking trash out to the street, the task that she performed, at least in part, to help the property owner, Ester Miller." Judgment

was entered in favor of Greenbaum for just under $250,000. Brandy and Sandra subsequently assigned their claims against Burlington to Greenbaum in exchange for a covenant not to execute on the judgment. Greenbaum then brought this action for breach of the insurance contract and tortious breach of the covenant of good faith and fair dealing. Because the undisputed facts support Burlington's rejection of the tenders Brandy and Sandra made seeking to be deemed "additional insureds" under Ester's policy, its motion for summary judgment will be granted.

## II. BACKGROUND

As explained above, this is a dispute over whether Burlington was obligated to provide at least a defense—if not defense and indemnity—to Brandy and Sandra as "additional insureds" under Ester's policy. The claim was tendered to Burlington twice, and rejected twice.

### The 2012 tender

Brandy and Sandra apparently had access to limited legal services through a group legal plan policy provided by the employer of Brandy's father. Under that plan, in September of 2012, a lawyer representing Brandy and Sandra wrote a tender letter to the attorney who was already representing Ester in the state court litigation initiated by Greenbaum. At the time, the lawyer had not yet received a copy of the policy, with the result that his tender was made in general terms. That tender letter apparently was not passed on to Burlington until November of 2012.

Claims representative Clifford B. Kelley, who has now been deposed in this action,[1] issued a denial of the tender, stating, "[o]ur investigation reveals that Brandy Miller and Sandra Jean Miller are not named insured's [sic], additional insureds,

or insureds by any definition under the policy." Plaintiff insists that Kelley's testimony reveals Burlington effectively did no investigation prior to issuing the coverage denial. Burlington argues it was familiar with the allegations in the complaint and the evidence that had been developed in the state court proceeding because it was already defending Ester, and that it therefore needed to do nothing more than it did in making the determination that Brandy and Sandra were not entitled to coverage as "additional insureds."

### The 2014 tender

Shortly before trial, Sandra and Brandy's counsel re-tendered to Burlington, this time contending that Sandra and Brandy "essentially served as agents of the named insured, Ester Miller, by virtue of the undertaking of our clients to maintain, improve and service not only the residence where they live ... but a number of the other scheduled properties owned by Ester Miller." The tender further argued that based on this "master-servant · or 'agency' relationship, between Ester, as principal/named insured, and our clients, as Ester's agents (living rent free as family members but subject to any variety of requests for services that were routinely performed)," both a defense and indemnity was owed.

Counsel for Sandra and Brandy advised he was intending to submit stipulated facts to the trial court acknowledging all of the following:

(1) "An oral rental agreement existed between Defendants [Sandra and Brandy] and Ester Miller, as owner of the subject premises, allowing Defendants to reside at the subject premises";

---

1. Under Fed. R. Civ. P. 56(f) plaintiff was previously granted a continuance of this motion, and the opportunity to submit further briefing, so that Kelley's deposition could take place.

(2) As "Plaintiff approached the outside screen door and the front door of the subject residence, both were opened by Defendant Sandra Miller, who was taking out garbage";

(3) "Defendant Brandy Miller's dog, Nawla (hereinafter 'Dog'), was thereby allowed to exit the subject residence onto the front porch where Plaintiff was standing with [a] package for delivery"; and

(4) The Dog "aggressively charged Plaintiff," and "bit him severely on his left thigh area."

Under the heading "Sandra Miller's work in exchange for rent," the proposed stipulation of facts also stated that Sandra:

a. painted interior walls of Ester's residence and other properties;

b. cleaned properties in preparation for new tenants;

c. helped remove a fence at Ester's residence;

d. helped move furniture in and out of various properties; and

e. took garbage and unwanted items and furniture to the dump.

Burlington again declined the tender on the basis that Sandra and Brandy were not insureds, explaining its view that even if they sometimes did act as "volunteer workers" for Ester, they were not acting as such at the time of the incident.

The state court trial

A bench trial was held in June of 2014. The parties submitted the stipulated facts described above. Greenbaum then testified that on December 15, 2011, he was working for UPS as a driver's helper delivering packages. He had a package to deliver to Sandra and Brandy's house. As he was approaching the house he "could see that there was a security door, a metal security door, and there was an interior door behind it. Both of them were closed at the time."

When Greenbaum got about halfway across the porch, the interior door opened, and he "could hear barking and snarling from a dog, and it turned out it was two dogs." He then "heard a woman start screaming, 'No, no, no,' and then the security door burst open. A "grayish" dog started charging at him. The dog bit him on the left thigh and the right buttock.

Sandra then testified that Brandy was the owner of Nawla[2], the dog that bit Greenbaum, while she (Sandra) owned another dog. Before asking Sandra about the incident, however, Greenbaum's counsel asked Sandra a number of questions regarding her relationship and agreement with Ester Miller:

Q: Now, as part of the circumstances where you're living at this residence ... you had no written lease or rental agreement. You had an oral agreement with Ester Miller, who is the owner of the premises, to stay at that home rent-free?

A: Yes.

Q: In exchange for that agreement to live at the home, you would perform tasks at Ester Miller's request, maintenance tasks, painting, cleaning, taking out trash, taking stuff to the dump, those types of things?

A: Yes.

Q: And under these circumstances of living rent-free with Ester Miller, did you essentially consider yourself and Brandy on call to do whatever it was that Ester Miller may want of you in terms of performing maintenance tasks and services around the premises?

A: I'm not so sure on call, but we would do them as they came up.

2. The spelling of the dog's name varies in the record.

Q: Okay. Indeed, Ester Miller owns her own house which is separate and apart from yours . . . right?

A: Yes.

Q: And then owns various properties . . . there were other properties she owned as well?

A: Yes.

At this point, the judge interrupted to ask what point counsel was trying to establish through that line of questioning. He noted he had already granted summary judgment for Ester. He also observed there was "a lot in the stipulated facts that have to do with the relationship with Ester." The judge stated, "[t]hese questions seem to be related to establishing liability of Ester, who is out on the summary judgment."

Greenbaum's counsel responded that "there's an issue that pertains to insurance coverage that has been denied." He offered to explain in more detail. The judge invited counsel to go off the record and to discuss the matter in chambers, which they apparently did.

When they returned, Greenbaum's counsel continued questioning Sandra about her relationship with Ester, and asked her to "describe the kinds of things you did volunteer to do for her."

A: I would paint different places, I would clean kitchens, you know, the oven, the stove, the floor, take garbage to the sanitary district on a truck. What else did I do? That's all I can think of at the moment. I did a lot of painting, inside and outside.

Q: Okay. Did you take out her garbage on occasion?

A: I have in the past.

Q: All right. And, in fact, at the time of this incident, this dog bite incident, you had trash bags in your hands ready to take them out when the incident happened, right?

A: Correct.

Q: So, in fact, you're [sic] carrying out trash would be similar to the kinds of things that you were volunteering to do for Ester on other properties that she owned?

A: Yes.

Greenbaum's counsel also asked Sandra about the incident itself:

Q: Okay. But at the time you're opening the door to walk out with the garbage bags—

A: Uh-huh.

Q: —to take out the garbage, did you have an intent at that point in time that Nala would go out with you?

A: No, no, no.

Q: Was it your expectation that Nala would remain inside the house?

A: Yes.

Greenbaum's counsel then asked Brandy about her relationship with Ester:

Q: All right. Similar to what I was asking your mother . . . did you from time to time volunteer services to Ester Miller to maintain some of the premises that she owned there?

A: Yes.

Q: And what kinds of services or tasks would you be performing in that volunteer basis for Ester Miller?

A: The main thing as far back as I can remember even when I was a kid, I would paint the inside and outside. But that was more like helping my dad when I was younger. But as I got older, I was able to do it on my own. Because they're old houses, sometimes the nails come out from the steps, so I maintained the steps on pretty much my property— well, not my property, but where I live, where my grandmother lives and the building where my father lives, the back steps, just to make sure no one falls, especially my grandmother because of her age. I put up the beware of dog

signs. I picked the tile in—where I live, I picked those tiles and I placed them. I think I'm forgetting some things.

Q: That's fair enough. That's good. Would you—as a resident ... would you consider yourself somewhat on call to provide services or any services that Ester may ask of you in that capacity to maintain her properties?

A: Well, I kind of feel the same way my mom does. It was more like just whenever it would come up, we would do it.

Q: Volunteer to do it?

A: Yeah.

As noted above, at the conclusion of the trial, the court rendered judgment in favor of Greenbaum. Brandy was found strictly liable as owner of the dog, and Sandra was found negligent for allowing the dog to go free while she was "taking trash out to the street, the task that she performed, at least in part, to help the property owner, Ester Miller."

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the

non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.,* "facts that might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the non-moving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## IV. DISCUSSION

Greenbaum, as assignee of Sandra and Brandy, contends they were entitled to indemnity, or at the very least a defense, and that Burlington's failure to provide either supports a bad faith claim, especially the refusal to provide a defense.

### a. *Indemnity*

■ Greenbaum argues Sandra and Brandy qualify as additional insureds under Ester's policy because they effectively were either her employees or her "volunteers."

Under Section II—"Who Is an Insured," the Burlington policy provides, in pertinent part,

> Each of the following is also an insured: a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees" .... but only within the scope of their employment by you or while performing duties relating to the conduct of your business.

The policy defines a "volunteer worker" as "a person who is not your 'employee', and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you."[3] Whatever argument might exist that Brandy and Sandra were Ester's employees or volunteers *when engaged in the various tasks they carried out for her*, there was and is no evidence whatsoever to support a conclusion that this incident occurred while they were "performing duties related to the conduct of [Ester's] business" or within the scope of any such "employment."

■ Greenbaum argues Burlington is bound by the state court's finding that Sandra was "taking trash out to the street, the task that she performed, at least in part, to help the property owner, Ester Miller."[4] Where an insurer refuses to defend, the rule is that the insurer:

> is bound by a judgment in the action, in the absence of fraud or collusion, as to all material findings of fact *essential to the judgment* of liability of the insured. The insurer is not bound, however, as to issues *not necessarily adjudicated in the prior action* and can still present any defenses not inconsistent with the judgment against the insured.

*Geddes & Smith, Inc. v. St. Paul–Mercury Indem. Co.*, 51 Cal.2d 558, 561–62, 334 P.2d 881 (1959) (emphasis added); *accord Garamendi v. Golden Eagle Ins. Co.*, 116

---

**3.** Burlington asserts Sandra and Brandy never contended they were Ester's employees when tendering the claim. Burlington has argued, however, that they could not have been "volunteers" because they received free housing in exchange for the services they provided. Ultimately the possible distinction between "employee" and "volunteer" is not material on the facts of this case, because the policy only affords coverage where either a volunteer or employee is "performing duties relating to the conduct of [the named insured's] business" or acting within the scope of any employment. The undisputed facts show that Brandy and Sandra cannot meet that requirement.

**4.** Brandy's claim for coverage as a volunteer or employee of Ester's is even less tenable than Sandra's. Brandy was found strictly liable as the *dog's owner*. There is no conceivable basis for arguing she owned the dog in her capacity as an employee or volunteer.

Cal.App.4th 694, 717–18, 10 Cal.Rptr.3d 724 (2004).

As Burlington points out, the state court's statement that Sandra was "at least in part" helping Ester was *not* material to the issues to be decided in that action. Additionally, Greenbaum has pointed to no evidence that supported that assertion. Rather, the transcript shows counsel asked Sandra a narrower question: ".... you're [sic] carrying out trash *would be similar* to the kinds of things that you were volunteering to do for Ester on other properties that she owned?" (emphasis added). Sandra's affirmative response in no way supports a finding that she was carrying out trash at her own residence as part of "performing duties related to the conduct of [Ester's] business" or within the scope of any "employment" by Ester. Accordingly, the undisputed facts support the conclusion that Burlington had and has no duty to indemnify either Brandy or Sandra, and Greenbaum's claim as their assignee fails.

### b. *Defense*

■ At the time of the 2014 tender, Burlington undisputedly had before it not only the substantial factual record of the litigation proceedings to date, but also the proposed stipulated facts on which Brandy and Sandra intended to go to trial. In denying coverage, Burlington explained that, even assuming Brandy and Sandra served as volunteer workers for Ester on occasion, there was no evidence the dog bite incident arose from such services, and therefore no basis to deem them "additional insureds" entitled to either a defense or indemnity. As reflected in the discussion above, this conclusion was sound. Although the duty to defend is broader than the duty to indemnify, the facts allowed for no possibility of coverage sufficient to trigger any duty to defend.

Greenbaum places the greatest weight on arguing that Burlington is liable for denying any duty to defend at the time of the 2012 tender. As noted, at the time that tender was made, counsel for Sandra and Brandy did not possess a copy of the policy, and therefore was unable to articulate any specific arguments as to why coverage should be available. Pointing to the deposition testimony of Clifford Kelley, Greenbaum insists Burlington did no meaningful investigation at all, because it apparently did not review the underlying complaint, and took as little as 25 minutes before drafting a denial letter. Greenbaum asserts that the underlying complaint included language that Sandra and Brandy were "agents" of Ester, and that if Burlington had given the matter any substantial analysis, it would have realized there was at least a *possibility* that they could qualify as "additional insureds" on some theory.

As set out above, Burlington contends no more extensive investigation was required because it was already familiar with the underlying complaint and the factual record that had been developing. It also argues the cited evidence does not conclusively establish how much time was spent on the matter before the denial letter was drafted.

Greenbaum insists that Kelley's testimony reveals he misunderstood Burlington's legal obligations under California law, and that his denial of coverage—necessarily reflecting that misunderstanding—therefore was wrongful. Indeed, some of Kelley's statements reasonably could be understood to suggest he believed the familiar principle that the duty to defend is broader than the duty to indemnify does not apply where the claimant seeks coverage only as an "additional insured," until and unless the claimant establishes he or she is in fact an additional insured. Regardless of Kelley's precise

subjective understanding of the law, however, there simply was nothing in the facts and allegations undisputedly in Burlington's possession at the time of the 2012 tender to support a conclusion that the incident occurred in any context in which Sandra—much less Brandy—could have been considered to be acting as Ester's agent, employee, or volunteer. Thus, even assuming Kelley applied too stringent of a standard when evaluating potential coverage, Greenbaum cannot show that the application of the correct standard would have led to a different result. Nor has Greenbaum pointed to any authority suggesting a potential insured should be entitled to the windfall of receiving a defense (or indemnity) where coverage is correctly denied, simply because the claims adjuster may have not correctly understood, or been able to articulate, the appropriate legal standard.

c. *Bad Faith*

The absence of a viable claim for breach of the duty to indemnify or to defend "conclusively negates" liability for bad faith. *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal.App.4th 932, 943, 4 Cal. Rptr.3d 528 (2003). Additionally, for the reasons explained above, any evidence suggesting that Kelley may have misapprehended the relevant legal standard did not result in an erroneous coverage decision. As such, it cannot support a bad faith claim.

## V. CONCLUSION

The motion for summary judgment is granted. A separate judgment will enter. **IT IS SO ORDERED.**